## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE DISTRICT OF DELAWARE

```
-------------------------------------------------
                                    )
In re:                              )   Chapter 11
                                    )
ANPATH GROUP, INC.                  )   Case No. 10-11652 (KJC)
                                    )
                    Debtor          )
                                    )
-------------------------------------------------  )
```

## FIRST AMENDED DISCLOSURE STATEMENT WITH RESPECT TO PLAN OF
## REORGANIZATION OF ANPATH GROUP, INC.


      PLEASE READ THIS DISCLOSURE STATEMENT CAREFULLY. THIS DISCLOSURE STATEMENT CONTAINS INFORMATION THAT MAY BEAR UPON YOUR DECISION TO ACCEPT OR REJECT THE DEBTOR'S PLAN OF REORGANIZATION, WHICH THE DEBTOR FILED ON THE PETITION DATE. THE DEBTOR BELIEVES THAT ITS PLAN OF REORGANIZATION IS IN THE BEST INTERESTS OF CREDITORS AND THAT THE PLAN IS FAIR AND EQUITABLE. THE DEBTOR URGES THAT THE VOTER ACCEPT THE PLAN.


COZEN O'CONNOR
Mark E. Felger
1201 N. Market Street, Suite 1400
Wilmington, DE 19801
Telephone: (302) 295-2000

Counsel to Debtor


Dated: June 29, 2010

**EXECUTIVE SUMMARY**

On May 20, 2010, Anpath Group, Inc. ("the "Debtor"), a Delaware corporation, filed a voluntary petition under Chapter 11 of title 11 of the United States Code (the "Bankruptcy Code") in the United States Bankruptcy Court for the District of Delaware. Chapter 11 of the Bankruptcy Code allows a debtor to propose a plan of reorganization that dictates treatment of claims against, and shareholder interests in, such a debtor company. A plan of reorganization must be voted on by holders of claims and interests and then must meet various standards to be approved (or confirmed) by the Bankruptcy Court. Consummation of a confirmed plan of reorganization is necessary for a debtor to emerge from Chapter 11.

Capitalized terms used herein and not otherwise defined shall have the meaning assigned to such term in the Plan of Reorganization of Anpath Group, Inc. (as amended, the "Plan").

The purpose of this Disclosure Statement is to provide to the Holders of Claims against, and Interests in, the Debtor adequate information to make an informed judgment about the Plan, which is annexed to this document as Appendix A.

**A.      The Need for Chapter 11 Restructuring**

The Debtor is in default or is approaching default on its Secured Loan Agreements and Secured Notes totaling approximately $3,380,700 as of May 10, 2010. In the fiscal years ended March 31, 2008 and 2009, the Debtor reported net losses of $4,948,301 and $4,023,929. While smaller, less experienced, and lacking the resources of its major competitors, the Debtor's operating subsidiary has established strong positions in several major markets, including a letter of intent with a major supplier of oil and gas drilling chemicals and a distribution contract with a national franchise cleaning service.

The Debtor has invested in and finances its operations principally through debt issued by the Debtor. The Plan is based upon a consensual restructuring of all of the Debtor's debt, as set forth below.

The Debtor's principal obligations for funded debt are: (i) principal and accrued interest on Secured Loan Agreement and Secured Notes due May 15, 2010 in the approximate amount of $2,036,882; (ii) principal and accrued interest due on 6% Convertible Notes entered into in 2008 in the approximate amount of $202,576; (iii) principal and accrued interest due on 8% Convertible Notes entered into on April 8, 2009 in the approximate amount of $585,397; (iv) principal and accrued interest due on 8% Convertible Notes entered into on July 1, 2009 in the approximate amount of $382,684; and (v) principal and accrued interest due on 8% Convertible Notes entered into from August 25, 2009 through December 24, 2009 in the approximate amount of $537,302.

Faced with declining liquidity, upcoming interest payments, over $2,910,000 in 2010 debt maturities, and the inability to access the capital markets to restructure its balance sheet, the Debtor pursued various strategic alternatives in late 2009 and early 2010, including seeking to extend the maturities on its debt due in 2010, seeking to implement debt exchanges, seeking to issue new debt for cash and/or in exchange for debt, and pursuing asset sales. Ultimately, the efforts to restructure outside of Chapter 11 were unsuccessful and the Debtor commenced negotiations with its Secured Lender and the Consenting Noteholders. Those negotiations led to the formation of the consensual Plan to restructure the Debtor's debt obligations, and the Debtor filed this Chapter 11 Case to implement its restructuring.

## B.    Capital and Equity Structure

The following table describes the Debtor's various material capital obligations and equity interests, ranked in order of relative priority based on either contractual or structural subordination:

| | |
|---|---|
| **1.    Secured Loan Agreement and Secured Note** | |
| **Secured Loan Agreement and Secured Note:**  A $1,500,000 secured loan facility entered into on January 8, 2008, by the Debtor and ANPG Lending, LLC, secured by first priority liens on the Debtor's assets and properties. Approximately $1,500,000 principal and $249,375 accrued interest remained outstanding as of the Petition Date. | |
| **2.    Secured Loan Agreements and Secured Notes** | |
| **Secured Loan Agreements and Secured Notes:**  Various secured loan facilities entered into on April 1, 2010 through May 3, 2010, by the Debtor and various lenders, secured by first priority liens on the Debtor's assets and properties.  Approximately $286,000 principal and $1,507 accrued interest remained outstanding as of the Petition Date. | |
| **3.    6% 2008 Convertible Notes** | |
| **6% 2008 Convertible Notes:**  6% convertible notes due on or before March 15, 2009.  Approximately $184,700 principal and $17,876 accrued interest remained outstanding as of the Petition Date. | |
| **4.    8% April 8, 2009 Convertible Notes** | |
| **8% April 8, 2009 Convertible Notes:**  8% convertible notes due on April 8, 2010.  Approximately $537,500 principal and $47,897 accrued interest remained outstanding as of the Petition Date. | |
| **5.    8% July 1, 2009 Convertible Notes** | |
| **8% July 1, 2009 Convertible Notes:**  8% convertible notes due on July 1, 2010.  Approximately $357,500 principal and $25,184 accrued interest remained outstanding as of the Petition Date. | |
| **6.    8% 2010 Convertible Notes** | |
| **8% 2010 Convertible Notes:**  8% convertible notes due from August 25, 2010 through December 24, 2010. Approximately $515,000 principal and $22,302 accrued interest remained outstanding as of the Petition Date. | |
| **7.    Equity Interests** | |
| **Preferred Stock:**  As of May 14, 2010, 5 million shares of preferred stock were authorized and 0 shares were issued and outstanding.<br><br>**Common Stock:**  As of May 14, 2010, 300 million shares of common stock were authorized and 17,466,295 shares were issued and outstanding. | |

## C.    Restructuring Under the Plan

### 1.    Administrative and Priority Tax Claims

Subject to the provisions of sections 330(a), 331, and 503(b) of the Bankruptcy Code, each Holder of an Administrative Claim shall be paid by the Debtor, at its election, in full, in Cash, upon the latest of (i) the Effective

Date, (ii) the due date thereof in accordance with its terms, (iii) in respect of liabilities incurred in the ordinary course of business, the date upon which such liabilities are payable in the ordinary course of such Debtor's business, consistent with past practices, or (iv) such other date as may be agreed upon between the Holder of such Administrative Claim, the Debtor, and the Secured Lender.

Unless the Holder of such Claim and the Debtor agree to a different treatment, on the Effective Date, each Holder of an allowed Priority Tax Claim shall either (i) have its Claim Reinstated or (ii) receive equal Cash payments during a period not to exceed six years after the assessment of the tax on which such Claim is based, totaling the aggregate amount of such Claim, plus simple interest at the rate required by applicable law on any outstanding balance from the Effective Date, or such lesser rate as is agreed to by a particular taxing authority.

2.    *Unimpaired Claims*

Pursuant to the Plan, two classes of Claims will be reinstated on the Effective Date unless the Holders of such Claims and the Debtor agree to a different treatment. The reinstated Claims are, therefore, unimpaired by the Chapter 11 Case. Accordingly, the Holders of such Claims will not be entitled to vote. The following classes of Claims are unimpaired:

- Class 1: Non-Tax Priority Claims. Class 1 consists of all unsecured claims entitled to priority in payment pursuant to sections 507(a) and 507(b) of the Bankruptcy Code other than Priority Tax Claims and Administrative Claims;

- Class 2: Other Secured Claims. Class 2 consists of all Claims (but excluding any Secured Lien Claims) that are secured by a lien on property in which the Debtor's Estate has an interest or that is subject to setoff under section 553 of the Bankruptcy Code, to the extent of the value of the Claim Holder's interest in the Estate's interest in such property or to the extent of the amount subject to setoff, as applicable, as determined pursuant to section 506(a) of the Bankruptcy Code or, in the case of the setoff, pursuant to section 553 of the Bankruptcy Code; provided, that such lien or right of setoff is not subject to avoidance or otherwise invalid under the Bankruptcy Code or applicable state law;

3.    *Impaired Claims*

The impaired classes are comprised of certain Holders of Convertible Notes, General Unsecured Claims, and Equity Interests. The Plan provides for a distribution to members of all impaired classes.

The chart below lists the impaired classes of claims and summarizes the treatment that each class will receive once all higher ranking classes are paid in full.

| Description and Amount of Claims or Interests | Summary of Treatment |
|---|---|
| **Class 3: Secured Lien Claims**<br><br>Class 3 consists of all Secured Lien Claims.<br><br>Estimated Amount of Secured Lien Claims: Approximately $1,786,000 plus all accrued and unpaid interest owing under the Secured Note. | Each Holder of a Class 3: Secured Lien Claim is entitled to vote to accept or to reject the Plan.<br><br>On the Effective Date, each Holder of a Secured Lien Claim shall receive its Pro Rata share of 61.0% of the Distributable New Equity, subject to dilution if the Debtor consummates the Private Placement Offering. The Secured Lender shall receive payment, in cash, of all reasonable fees, expenses and disbursements, including attorney's fees. |

| Description and Amount of Claims or Interests | Summary of Treatment |
|---|---|
| **Class 4: Convertible Notes Claims**<br><br>Class 4 consists of all Convertible Notes Claims.<br><br>Estimated Amount of Convertible Notes Claims: Approximately $1,594,700 plus all accrued and unpaid interest owing under the Convertible Notes. | Each Holder of a Class 4 Claim is entitled to vote to accept or to reject the Plan.<br><br>On the Effective Date, each Holder of a Convertible Notes Claim shall be entitled to receive its Pro Rata share of 34% of the Distributable New Equity, subject to dilution if the Debtor consummates the Private Placement Offering. |
| **Class 5: General Unsecured Claims**<br><br>Class 5 consists of all General Unsecured Claims. | Each Holder of a Class 5 Claim is entitled to vote to accept or to reject the Plan.<br><br>Unless the Holder of such Claim and the Debtor agree to a different treatment, on the Effective Date, each Holder of a General Unsecured Claim shall be entitled to receive cash in an amount equal to 50% of the allowed amount of such Claim. |
| **Class 6: Old Common Stock Interests**<br><br>Class 6 consists of all Old Common Stock Interests. | Each Holder of a Class 6 Interest is entitled to vote to accept or to reject the Plan.<br><br>On the Effective Date, the Old Common Stock will be cancelled, and Holders of Old Common Stock shall receive their Pro Rata share of 5.0% of the Distributable New Equity, subject to dilution if the Debtor consummates the Private Placement Offering. |

**TABLE OF CONTENTS**

                                                                                                              **Page**

DISCLOSURE STATEMENT WITH RESPECT TO PLAN OF REORGANIZATION OF ANPATH GROUP, INC. ..................................................................................................................................... 1

A.  The Need for Chapter 11 Restructuring ............................................................................. i

B.  Capital and Equity Structure ............................................................................................ ii

C.  Restructuring Under the Plan ........................................................................................... ii

   1.  Administrative and Priority Tax Claims ....................................................................... ii
   2.  Unimpaired Claims ....................................................................................................... iii
   3.  Impaired Claims ............................................................................................................ iii

     I.     INTRODUCTION AND DISCLAIMER ................................................. 1
     II.    OVERVIEW OF THE DEBTOR AND THE PLAN .................................. 4
     III.   PLAN VOTING INSTRUCTIONS AND PROCEDURES ..................... 7
     IV.    HISTORY AND STRUCTURE OF THE DEBTOR ............................... 10
     V.     SUMMARY OF STRATEGIC INITIATIVES ...................................... 12
     VI.    THE CHAPTER 11 CASE ...................................................................... 14
     VII.   SUMMARY OF THE PLAN OF REORGANIZATION ...................... 14
     VIII.  RISK FACTORS TO BE CONSIDERED ............................................. 27
     IX.    CERTAIN U.S. FEDERAL INCOME TAX CONSEQUENCES OF THE PLAN ... 32
     X.     FEASIBILITY OF THE PLAN AND BEST INTEREST OF CREDITORS ......... 35
     XI.    ALTERNATIVES TO CONFIRMATION AND CONSUMMATION OF THE PLAN ... 38
     XII.   THE SOLICITATION; VOTING PROCEDURE .................................. 39
     XIII.  CONCLUSION AND RECOMMENDATION ...................................... 42

     PLAN OF REORGANIZATION OF ANPATH GROUP, INC. ................................................ 44
     PREPETITION FINANCIAL RESULTS ................................................................................. 45
     FINANCIAL FORECASTS ....................................................................................................... 63

**TABLE OF APPENDICES**

| Appendix | Name |
|---|---|
| Appendix A | PLAN OF REORGANIZATION OF ANPATH GROUP, INC. |
| Appendix B | PLAN SUPPORT AGREEMENT |
| Appendix C | PREPETITION FINANCIAL RESULTS |
| Appendix D | FINANCIAL FORECASTS |

## I.    INTRODUCTION AND DISCLAIMER

The Debtor submits this disclosure statement (the "Disclosure Statement") pursuant to section 1125 of the Bankruptcy Code, for use in the solicitation of votes on the Plan of Reorganization of Anpath Group, Inc. (the "Plan"), filed with the United States Bankruptcy Court for the District of Delaware (the "Bankruptcy Court"). A copy of the Plan is annexed as Appendix A to this Disclosure Statement.

This Disclosure Statement sets forth certain information regarding the Debtor's prepetition operating and financial history, the need to seek Chapter 11 protection, significant events in the Chapter 11 case, and the anticipated organization of the Reorganized Debtor upon successful emergence from Chapter 11. This Disclosure Statement also describes terms and provisions of the Plan, including certain alternatives to the Plan, certain effects of confirmation of the Plan, certain risk factors associated with securities to be issued under the Plan, and the manner in which distributions will be made under the Plan. In addition, this Disclosure Statement discusses the confirmation process and the voting procedures that holders of claims entitled to vote under the Plan must follow for their votes to be counted.

Except as otherwise provided herein, capitalized terms not otherwise defined in this Disclosure Statement have the meanings ascribed to them in the Plan. Unless otherwise noted herein, all dollar amounts provided in this Disclosure Statement and in the Plan are given in U.S. dollars.

This Disclosure Statement describes certain aspects of the Plan, the Debtor's operations, the Debtor's Financial Forecasts, and other related matters. FOR A COMPLETE UNDERSTANDING OF THE PLAN, YOU SHOULD READ THIS DISCLOSURE STATEMENT, THE PLAN, AND THE EXHIBITS, APPENDICES, AND SCHEDULES THERETO IN THEIR ENTIRETY. IF ANY INCONSISTENCY EXISTS BETWEEN THE PLAN AND THIS DISCLOSURE STATEMENT, THE TERMS OF THE PLAN ARE CONTROLLING.

NO PERSON IS AUTHORIZED BY THE DEBTOR IN CONNECTION WITH THE PLAN OR THE SOLICITATION OF ACCEPTANCES OF THE PLAN TO GIVE ANY INFORMATION OR TO MAKE ANY REPRESENTATION REGARDING THIS DISCLOSURE STATEMENT OR THE PLAN OTHER THAN AS CONTAINED IN THIS DISCLOSURE STATEMENT AND THE EXHIBITS, APPENDICES, AND/OR SCHEDULES ATTACHED HERETO OR INCORPORATED BY REFERENCE OR REFERRED TO HEREIN, AND, IF GIVEN OR MADE, SUCH INFORMATION OR REPRESENTATION MAY NOT BE RELIED UPON AS HAVING BEEN AUTHORIZED BY THE DEBTOR.

THIS DISCLOSURE STATEMENT DOES NOT CONSTITUTE LEGAL, BUSINESS, FINANCIAL, OR TAX ADVICE. ANY CREDITOR DESIRING ANY SUCH ADVICE OR ANY OTHER ADVICE SHOULD CONSULT WITH ITS OWN ADVISORS.

THE STATEMENTS CONTAINED IN THIS DISCLOSURE STATEMENT ARE MADE AS OF THE DATE HEREOF UNLESS ANOTHER TIME IS SPECIFIED HEREIN, AND THE DELIVERY OF THIS DISCLOSURE STATEMENT WILL NOT CREATE AN IMPLICATION THAT THERE HAS NOT BEEN ANY CHANGE IN THE INFORMATION STATED SINCE THE DATE HEREOF.

THE INFORMATION CONTAINED IN THIS DISCLOSURE STATEMENT, INCLUDING THE INFORMATION REGARDING THE HISTORY, BUSINESS, AND OPERATIONS OF THE DEBTOR AND ITS NON-DEBTOR OPERATING SUBSIDIARIES AND THE HISTORICAL FINANCIAL INFORMATION REGARDING THE DEBTOR IS INCLUDED FOR PURPOSES OF SOLICITING ACCEPTANCES OF THE PLAN BUT, AS TO CONTESTED MATTERS AND ADVERSARY PROCEEDINGS, IS NOT TO BE CONSTRUED AS AN ADMISSION OR A STIPULATION BUT RATHER AS A STATEMENT MADE IN SETTLEMENT NEGOTIATIONS.

THIS DISCLOSURE STATEMENT MAY NOT BE RELIED ON FOR ANY PURPOSE OTHER THAN TO DETERMINE WHETHER TO VOTE TO ACCEPT OR TO REJECT THE PLAN, AND NOTHING STATED HEREIN WILL CONSTITUTE AN ADMISSION OF ANY FACT OR LIABILITY BY ANY PARTY, OR BE ADMISSIBLE IN ANY PROCEEDING INVOLVING THE DEBTOR OR ANY OTHER PARTY, OR BE

DEEMED A REPRESENTATION OF THE TAX OR OTHER LEGAL EFFECTS OF THE PLAN ON THE DEBTOR OR HOLDERS OF CLAIMS OR INTERESTS. CERTAIN OF THE STATEMENTS CONTAINED IN THIS DISCLOSURE STATEMENT ARE FORWARD LOOKING BY NATURE AND CONTAIN ESTIMATES AND ASSUMPTIONS. THERE CAN BE NO ASSURANCE THAT SUCH STATEMENTS WILL BE REFLECTIVE OF ACTUAL OUTCOMES. ALL HOLDERS OF CLAIMS SHOULD CAREFULLY READ AND CONSIDER THIS DISCLOSURE STATEMENT AND THE PLAN IN THEIR ENTIRETY, INCLUDING ARTICLE VIII - "RISK FACTORS TO BE CONSIDERED" -OF THIS DISCLOSURE STATEMENT, BEFORE VOTING TO ACCEPT OR TO REJECT THE PLAN.

EXCEPT AS OTHERWISE EXPRESSLY SET FORTH HEREIN, ALL INFORMATION CONTAINED HEREIN HAS BEEN PROVIDED BY THE DEBTOR.

## SPECIAL NOTE REGARDING FORWARD LOOKING STATEMENTS

This Disclosure Statement contains forward looking statements, including statements concerning possible or assumed future results of operations of the Debtor and those preceded by, followed by, or that include the word may, will, should, could, expects, plans, anticipates, believes, estimates, predicts, potential, or continue or the negative of such terms and other comparable terminology. You should understand that the factors described below, in addition to those discussed elsewhere in this Disclosure Statement, could materially affect the Debtor's future results and could cause those results to differ materially from those expressed in such forward looking statements. These factors include, but are not limited to, the factors discussed in Section VIII in this Disclosure Statement.

ANY FINANCIAL FORECASTS OR OTHER FORWARD LOOKING ANALYSES CONTAINED HEREIN WERE NOT PREPARED WITH A VIEW TO COMPLYING WITH THE GUIDELINES FOR PROSPECTIVE FINANCIAL STATEMENTS PUBLISHED BY THE AMERICAN INSTITUTE OF CERTIFIED PUBLIC ACCOUNTANTS. THE COMPANY'S INDEPENDENT REGISTERED PUBLIC ACCOUNTING FIRM HAS NEITHER COMPILED NOR EXAMINED THE ACCOMPANYING PROSPECTIVE FINANCIAL INFORMATION TO DETERMINE THE REASONABLENESS THEREOF AND, ACCORDINGLY, HAS NOT EXPRESSED AN OPINION OR ANY OTHER FORM OF ASSURANCE WITH RESPECT THERETO.

## II.    OVERVIEW OF THE DEBTOR AND THE PLAN

This Disclosure Statement contains, among other things, descriptions and summaries of provisions of the Plan.

The following overview is a general summary only, which is qualified in its entirety by, and should be read in conjunction with, the more detailed discussions, information, and financial statements and notes thereto appearing elsewhere in this Disclosure Statement and the Plan.

### A.    Business Overview

The Debtor was incorporated in the State of Delaware on August 26, 2004. The principal business of the Debtor is that of a holding company. The Debtor's wholly owned subsidiary is EnviroSystems Holdings, Inc., a Delaware Corporation which wholly owns EnviroSystems, Inc, a Nevada Corporation (hereinafter "ESI").

ESI provides infection control products on an international basis through both direct sales and channels of distribution. ESI's products are currently sold to transportation, military and industrial/institutional markets, and are manufactured utilizing chemical-emulsion technology, designed to make the products effective against a broad spectrum of harmful organisms while safe to people, equipment and habitat.

The Debtor is headquartered in Mooresville, North Carolina. As of the Petition Date, the Debtor had no employees in the United States, and ESI had 5 employees in the United States. ESI's primary operating markets are divided into four market segments: (1) surface care products (disinfectants/sanitizers/cleaners); (2) geobiocides for the oil & gas industry; (3) animal care products; and (4) personal care products. For the quarter ended March 31, 2010, the Debtor had revenue of $105,352 and for the year ended March 31, 2010, the Debtor had revenue of $426,910. The Debtor's revenues are principally derived from industrial applications for surface disinfectants/sanitizers/cleaners.

### B.    Existing Capital Structure

The Debtor's principal obligations for funded debt are: (i) principal and accrued interest on Secured Loan Agreement and Secured Notes due May 15, 2010 in the approximate amount of $2,036,882; (ii) principal and accrued interest due on 6% Convertible Notes entered into in 2008 in the approximate amount of $202,576; (iii) principal and accrued interest due on 8% Convertible Notes entered into on April 8, 2009 in the approximate amount of $585,397; (iv) principal and accrued interest due on 8% Convertible Notes entered into on July 1, 2009 in the approximate amount of $382,684; and (v) principal and accrued interest due on 8% Convertible Notes entered into from August 25, 2009 through December 24, 2009 in the approximate amount of $537,302.

### C.    Plan Negotiations

The Debtor believes that the value of the Debtor's business would be damaged significantly by a prolonged Chapter 11 case. After discussions with the Secured Lender and the Consenting Noteholders, the Debtor therefore concluded that the proposed restructuring should be implemented through the Plan Support Agreement. After several months of extensive negotiations, the Consenting Noteholders entered into the Plan Support Agreement with the Debtor and the Secured Lender supports the Plan. A true and correct copy of the form of Plan Support Agreement is annexed hereto as Appendix B.

### D.    General Structure of the Plan

The Plan is structured around a consensual restructuring of all debt held by the Debtor.

Under the Plan, there are four classes of Impaired Claims (Class 3: Secured Lien Claims, Class 4: Convertible Notes Claims, Class 5: General Unsecured Claims, and Class 6: Old Common Stock Interests). All other Claims and Interests are Unimpaired. Holders of Class 1: Non-Tax Priority Claims and Class 2: Other Secured Claims will be unaffected by the Plan.

The Debtor and the Secured Lender recognize that the continued dedication of the Debtor's trade creditors and other unsecured creditors to the Debtor's business is critical to maximizing value. In this regard, as set forth below, the Secured Lender and the Consenting Noteholders have authorized and consented to the restructuring of their debt to provide for (i) 61.0% of the Distributable New Equity, subject to dilution if the Debtor consummates the Private Placement Offering, to Class 3: Secured Claims, (ii) 34.0% of the Distributable New Equity, subject to dilution if the Debtor consummates the Private Placement Offering, to Class 4: Convertible Notes Claims, (iii) cash in an amount equal to 50% of the allowed Claim amount to Class 5: General Unsecured Claims, and (iv) 5.0% of the Distributable New Equity, subject to dilution if the Debtor consummates the Private Placement Offering, to Class 6: Old Common Stock Interests. Specifically, the Plan provides for the Debtor's balance sheet to be restructured by distributing new equity to Class 3: Secured Lien Claims, Class 4: Convertible Notes Claims, and Class 6: Old Common Stock Interests.

## E.     Summary of Treatment of Claims and Interests Under the Plan

### 1. Overview of Treatment

As contemplated by the Bankruptcy Code, Administrative Claims and Priority Tax Claims are not classified under the Plan. Administrative Claims are to be paid in full upon the latest of (i) the Effective Date, (ii) the due date thereof in accordance with their terms, (iii) for ordinary course Administrative Claims, when such claims become due, or (iv) such other date agreed upon by the Holder of the Administrative Claim, the Debtor and the Secured Lender. Unless the Holder of Such Claim and the Debtor agree otherwise, on the Effective Date Priority Tax Claims are to be either (i) Reinstated or (ii) paid in equal Cash payments during a period not to exceed six years after the assessment of the tax on which such Claim is based. See Section VII.C.1 for a summary of the treatment proposed under the Plan for Administrative Claims and Section VII.C.2 for a summary of the treatment proposed under the Plan for Priority Tax Claims.

In addition, the Plan provides that all Class 1 Non-Tax Priority Claims and Class 2 Other Secured Claims will be Reinstated, unless the Holder of such Claim or Interest and the Debtor agree to a different treatment.

The table below summarizes the classification and treatment of the prepetition Claims and Interests under the Plan. The distributions provided under the Plan are largely the product of extensive negotiations among the Debtor and certain of its creditors. As described in more detail in this Disclosure Statement, prior to the Petition Date the Debtor worked with the Secured Lender and the Consenting Noteholders to prearrange a financial restructuring that would result in a brief Chapter 11 case and a material reduction of debt and debt service. As a result of these negotiations, the parties reached agreement with respect to the distribution of New Common Stock to the Secured Lender, the Holders of the Convertible Notes ad current equity holders.

The Debtor intends to seek to consummate the Plan and cause the Effective Date to occur as quickly as practicable. There can be no assurance, however, as to when or whether the Effective Date will occur.

The Debtor believes that the Plan provides distributions to all Classes of Claims that reflect an appropriate resolution of the Claims, taking into account the differing nature and priority of such Claims.

2. *Classification of Debtor's Claims and Interests*

| Description and Amount of Claims or Interests | Summary of Treatment |
|---|---|
| **Class 3: Secured Lien Claims**<br><br>Class 3 consists of all Secured Lien Claims.<br><br>Estimated Amount of Secured Lien Claims: Approximately $1,786,000 plus all accrued and unpaid interest owing under the Secured Note. | Each Holder of a Class 3: Secured Lien Claim is entitled to vote to accept or to reject the Plan.<br><br>On the Effective Date, each Holder of a Secured Lien Claim shall receive its Pro Rata share of 61.0% of the Distributable New Equity, subject to dilution if the Debtor consummates the Private Placement Offering. The Secured Lender shall receive payment, in cash, of all reasonable fees, expenses and disbursements, including attorney's fees. |
| **Class 4: Convertible Notes Claims**<br><br>Class 4 consists of all Convertible Notes Claims.<br><br>Estimated Amount of Convertible Notes Claims: Approximately $1,594,700 plus all accrued and unpaid interest owing under the Convertible Notes. | Each Holder of a Class 4 Claim is entitled to vote to accept or to reject the Plan.<br><br>On the Effective Date, each Holder of a Convertible Notes Claim shall be entitled to receive its Pro Rata share of 34% of the Distributable New Equity, subject to dilution if the Debtor consummates the Private Placement Offering. |
| **Class 5: General Unsecured Claims**<br><br>Class 5 consists of all General Unsecured Claims. | Each Holder of a Class 5 Claim is entitled to vote to accept or to reject the Plan.<br><br>Unless the Holder of such Claim and the Debtor agree to a different treatment, on the Effective Date, each Holder of a General Unsecured Claim shall be entitled to receive cash in an amount equal to 50% of the allowed amount of such Claim. |
| **Class 6: Old Common Stock Interests**<br><br>Class 6 consists of all Old Common Stock Interests. | Each Holder of a Class 6 Interest is entitled to vote to accept or to reject the Plan.<br><br>On the Effective Date, the Old Common Stock will be cancelled, and Holders of Old Common Stock shall receive their Pro Rata share of 5.0% of the Distributable New Equity, subject to dilution if the Debtor consummates the Private Placement Offering. |

THE DEBTOR BELIEVES THAT THE PLAN PROVIDES THE BEST RECOVERIES POSSIBLE FOR HOLDERS OF CLAIMS AGAINST, OR INTERESTS IN, THE DEBTOR AND THUS STRONGLY RECOMMENDS THAT YOU VOTE TO ACCEPT THE PLAN.

## III. PLAN VOTING INSTRUCTIONS AND PROCEDURES

### A. Notice to Holders of Claims

Approval by the Bankruptcy Court of this Disclosure Statement means that the Bankruptcy Court has found that this Disclosure Statement contains information of a kind and in sufficient and adequate detail to enable Holders of Class 3, 4, 5, and 6 Claims or Interests to make an informed judgment about whether to accept or reject the Plan. THE BANKRUPTCY COURT'S APPROVAL OF THIS DISCLOSURE STATEMENT DOES NOT CONSTITUTE EITHER A GUARANTEE OF THE ACCURACY OR COMPLETENESS OF THE INFORMATION CONTAINED HEREIN OR THEREIN OR AN ENDORSEMENT OF THE PLAN BY THE BANKRUPTCY COURT.

IF THE PLAN IS APPROVED BY THE REQUISITE VOTE OF HOLDERS OF CLASS 3, 4, 5, AND 6 CLAIMS OR INTERESTS AND IS SUBSEQUENTLY CONFIRMED BY THE BANKRUPTCY COURT, THE PLAN WILL BIND ALL HOLDERS OF CLAIMS AGAINST, AND INTERESTS IN, THE DEBTOR, WHETHER OR NOT THEY WERE ENTITLED TO VOTE OR DID VOTE ON THE PLAN AND WHETHER OR NOT THEY RECEIVE OR RETAIN ANY DISTRIBUTIONS OR PROPERTY UNDER THE PLAN. THUS ALL HOLDERS OF CLASS 3, 4, 5, AND 6 CLAIMS OR INTERESTS ARE ENCOURAGED TO READ THIS DISCLOSURE STATEMENT AND ITS APPENDICES, SUPPLEMENTS AND EXHIBITS CAREFULLY AND IN THEIR ENTIRETY BEFORE DECIDING TO VOTE EITHER TO ACCEPT OR REJECT THE PLAN.

THIS DISCLOSURE STATEMENT AND THE PLAN ARE THE ONLY DOCUMENTS AUTHORIZED BY THE BANKRUPTCY COURT TO BE USED IN CONNECTION WITH THE SOLICITATION OF VOTES TO ACCEPT OR REJECT THE PLAN. No solicitation of votes may be made except after distribution of this Disclosure Statement, and no person has been authorized to distribute any information concerning the Debtor other than the information contained herein or therein. No such information should be relied upon in making a determination to vote to accept or reject the Plan.

### B. Voting Rights

Pursuant to the provisions of the Bankruptcy Code, only holders of claims and interests in classes that are (a) treated as "impaired" by a plan of reorganization and (b) entitled to receive a distribution under such plan are entitled to vote on the plan. Under the Plan, only Holders of Claims or Interests in Classes 3, 4, 5, and 6 are entitled to vote on the Plan. Claims and Interests in other Classes are Unimpaired and their Holders are deemed to have accepted the Plan.

Holders of Class 3, 4, 5, and 6 Claims or Interests may vote on the Plan only if they are holders as of June 30, 2010, the voting record date established by the Bankruptcy Court (the "Voting Record Date").

### C. Solicitation Package

In soliciting votes for the Plan pursuant to this Disclosure Statement, the Debtor, through its counsel, Cozen O'Connor, will send to Holders of Class 3, 4, 5, and 6 Claims or Interests who are entitled to vote copies of (a) this Disclosure Statement and Plan, (b) the notice of, among other things, (i) the date, time, and place of the hearing to consider confirmation of the Plan and related matters and (ii) the deadline for filing objections to confirmation of the Plan (the "Confirmation Hearing Notice"), (c) one or more beneficial owner ballots or master ballots (and return envelopes) to be used in voting to accept or to reject the Plan, and (d) other materials as authorized by the Bankruptcy Court.

If you are the Holder of a Class 3, 4, 5, and 6 Claim or Interest who is entitled to vote, but you did not receive a beneficial owner ballot or master ballot, or if your beneficial owner ballot or master ballot is damaged or illegible, or if you have any questions concerning voting procedures, you may contact the Debtor's counsel, which is serving as voting agent in this Chapter 11 Case, at the following address:

Cozen O'Connor
Attn: Mark E. Felger
1201 N. Market Street, Suite 1400
Wilmington, DE 19801
Telephone: (302) 295-2000

## D. Voting Procedures, Ballots, and Voting Deadline

After carefully reviewing the Plan, this Disclosure Statement, and the detailed instructions accompanying your beneficial owner ballot or master ballot, you are asked to indicate your acceptance or rejection of the Plan by voting in favor of or against the Plan on the accompanying beneficial owner ballot or master ballot. You should complete and sign your original beneficial owner ballot or master ballot (copies will not be accepted) and return it as instructed in the envelope provided.

This Disclosure Statement and the related materials will be furnished to Holders of the Convertible Notes whose names (or the names of whose nominees) appear as of the Voting Record Date on the security holder lists maintained by the Servicer pursuant to the Indentures governing the Convertible Notes or, if applicable, who are listed as participants in a clearing agency's security position listing. IF SUCH ENTITIES DO NOT HOLD FOR THEIR OWN ACCOUNT, THEY SHOULD PROVIDE COPIES OF THIS DISCLOSURE STATEMENT, THE PLAN AND, IF APPLICABLE, APPROPRIATE BENEFICIAL OWNER BALLOTS OR MASTER BALLOTS, TO THE BENEFICIAL OWNERS. Special voting instructions apply to nominees of beneficial owners and securities clearing agencies. Those special instructions will accompany the master ballot. Those instructions may be different from the general instructions contained herein. If you have any questions, please contact the Debtor.

All votes to accept or reject the Plan must be cast by using the beneficial owner ballot or master ballot enclosed with this Disclosure Statement or, in the case of a bank, brokerage firm or other nominee holding the Convertible Notes in its own name on behalf of a beneficial owner, or any agent thereof (each, a "Nominee"), the master ballot provided to such Nominee under separate cover (or manually executed facsimiles thereof). IN ORDER FOR YOUR VOTE TO BE COUNTED, YOUR BENEFICIAL OWNER BALLOT OR MASTER BALLOT MUST BE PROPERLY COMPLETED AS SET FORTH ABOVE AND IN ACCORDANCE WITH THE VOTING INSTRUCTIONS ON THE BENEFICIAL OWNER BALLOT OR MASTER BALLOT. UNLESS YOU HAVE RECEIVED A PRE-VALIDATED BENEFICIAL OWNER BALLOT (AS DESCRIBED HEREIN) FOR DIRECT RETURN TO THE DEBTOR, YOU MUST RETURN YOUR BENEFICIAL OWNER BALLOT TO YOUR NOMINEE IN ENOUGH TIME FOR YOUR VOTE TO BE PROCESSED ON A MASTER BALLOT AND SUBMITTED TO THE DEBTOR. MASTER BALLOTS AND PRE-VALIDATED BENEFICIAL OWNER BALLOTS MUST BE RECEIVED NO LATER THAN [_____], 2010, AT 4:00 P.M. EASTERN TIME (THE "VOTING DEADLINE") BY THE DEBTOR AT THE FOLLOWING ADDRESS:

Cozen O'Connor
Attn: Mark E. Felger
1201 N. Market Street, Suite 1400
Wilmington, DE 19801
Telephone: (302) 295-2000

UNLESS OTHERWISE PROVIDED IN THE INSTRUCTIONS ACCOMPANYING THE BENEFICIAL OWNER BALLOTS OR MASTER BALLOTS, FAXED BENEFICIAL OWNER BALLOTS OR FAXED MASTER BALLOTS WILL NOT BE TABULATED BY THE DEBTOR. PRE-VALIDATED BENEFICIAL OWNER BALLOTS OR MASTER BALLOTS THAT ARE RECEIVED BUT NOT SIGNED WILL NOT BE COUNTED. BENEFICIAL OWNER BALLOTS OR MASTER BALLOTS THAT ARE SIGNED BUT DO NOT SPECIFY WHETHER THE HOLDER ACCEPTS OR REJECTS THE PLAN WILL NOT BE COUNTED. DO NOT RETURN ANY STOCK CERTIFICATES, DEBT INSTRUMENTS, OR OTHER EVIDENCES OF YOUR CLAIM WITH YOUR BENEFICIAL OWNER BALLOT OR MASTER BALLOT.

If you have any questions about (a) the procedure for voting your Class 3, 4, 5, and 6 Claim or Interest, (b) the packet of materials that you have received, or (c) the amount of your Claim, or if you wish to obtain, at your own

expense unless otherwise specifically required by Rule 3017(d) of the Bankruptcy Rules, an additional copy of the Plan, this Disclosure Statement, or any appendices or exhibits to such documents, please contact:

> Cozen O'Connor
> Attn: Mark E. Felger
> 1201 N. Market Street, Suite 1400
> Wilmington, DE 19801
> Telephone: (302) 295-2000

For further information and general instruction on voting to accept or to reject the Plan, see Article XII of this Disclosure Statement and the instructions accompanying your beneficial owner ballot or master ballot.

THE DEBTOR URGES ALL HOLDERS OF CLASS 3, 4, 5, AND 6 CLAIMS OR INTERESTS ENTITLED TO VOTE TO EXERCISE THEIR RIGHT BY COMPLETING THEIR BENEFICIAL OWNER BALLOTS OR MASTER BALLOTS AND RETURNING THEM AS QUICKLY AS POSSIBLE. IF YOU HAVE RECEIVED A RETURN ENVELOPE ADDRESSED TO YOUR NOMINEE, PLEASE ALLOW ADDITIONAL TIME. ALL MASTER BALLOTS AND PRE-VALIDATED BENEFICIAL OWNER BALLOTS MUST BE RECEIVED BY THE DEBTOR BY THE VOTING DEADLINE.

### E.    Confirmation Hearing and Objections to Confirmation

Section 1128 of the Bankruptcy Code requires the Bankruptcy Court, after notice, to hold a hearing on confirmation of the Plan (the "Confirmation Hearing"). The Debtor has requested that the Bankruptcy Court schedule the Confirmation Hearing as soon as possible, at the United States Bankruptcy Court for the District of Delaware, 824 North Market Street Room 5 Wilmington, Delaware 19801. At the Confirmation Hearing, the Debtor will request confirmation of the Plan, as may be modified from time to time under section 1129(b) of the Bankruptcy Code. The Debtor may modify the Plan, to the extent permitted by section 1127(a) of the Bankruptcy Code and Rule 3019 of the Bankruptcy Rules, as necessary to confirm the Plan. The Confirmation Hearing may be adjourned from time to time by the Bankruptcy Court without further notice except for the announcement of the adjournment date made at the Confirmation Hearing or at any subsequently adjourned Confirmation Hearing. Notice of the Confirmation Hearing will be provided to Holders of Claims and Interests or their representatives (the "Confirmation Hearing Notice") pursuant to an order of the Bankruptcy Court. Objections to confirmation must be filed with the Bankruptcy Court by the date designated in the Confirmation Hearing Notice and are governed by Rules 3020(b) and 9014 of the Bankruptcy Rules. Objections to confirmation of the Plan must be made in writing and must specify in detail the name and address of the objector, all grounds for the objection, and the amount and Class of the Claim. UNLESS AN OBJECTION TO CONFIRMATION IS TIMELY SERVED AND FILED, IT MAY NOT BE CONSIDERED BY THE BANKRUPTCY COURT.

### F.    Confirmation Hearing and Deadline for Objections to Confirmation

#### 1. Confirmation Hearing

Section 1128(a) of the Bankruptcy Code requires the Bankruptcy Court, after notice, to hold a Confirmation Hearing. Section 1128(b) of the Bankruptcy Code provides that any party in interest may object to confirmation of the Plan. The hearing on confirmation of the Plan has been scheduled for [_____] at [_____]. Such hearing may be adjourned from time to time by announcing such adjournment in open court, all without further notice to parties-in-interest, and the Plan may be modified by the Debtor pursuant to section 1127 of the Bankruptcy Code prior to, during, or as a result of that hearing, without further notice to parties-in-interest.

#### 2. Date Set for Filing Objection To Confirmation of the Plan

The time by which all objections to confirmation of the Plan must be filed with the Court and received by the parties listed in the Confirmation Hearing Notice has been set for [_____] at [_____]. A copy of the Confirmation Hearing Notice is enclosed with this Disclosure Statement.

## IV. HISTORY AND STRUCTURE OF THE DEBTOR

### A. Overview of Business Operations and Corporate Structure

#### 1. Description of the Debtor's Business

The Debtor was incorporated in the State of Delaware on August 26, 2004. The principal business of the Debtor is that of a holding company. The Debtor's wholly owned subsidiary is EnviroSystems Holdings, Inc., a Delaware Corporation, which in turn wholly owns ESI.

ESI provides infection control products on an international basis through both direct sales and channels of distribution. ESI's products are currently sold to transportation, military and industrial/institutional markets, and are manufactured utilizing chemical-emulsion technology, designed to make the products effective against a broad spectrum of harmful organisms while safe to people, equipment and habitat.

The Debtor is headquartered in Mooresville, North Carolina. As of the Petition Date, the Debtor had no employees in the United States, and ESI had 5 employees in the United States. ESI's primary operating markets are divided into four market segments: (1) surface care products (disinfectants/sanitizers/cleaners); (2) geobiocides for the oil & gas industry; (3) animal care products; and (4) personal care products. For the quarter ended March 31, 2010, the Debtor had revenue of $105,352 and for the year ended March 31, 2010, the Debtor had revenue of $426,910. The Debtor's revenues are principally derived from industrial applications for surface disinfectants/sanitizers/cleaners.

#### 2. Prepetition Financial Results

Attached hereto as Appendix C to this Disclosure Statement is the selected financial data for the Debtor, including its direct and indirect subsidiaries, on a consolidated basis as presented in its 10K filed on July 10, 2009 for the years ended 2007, 2008, and 2009. The financial data for the years ended 2007, 2008, and 2009 were audited.

### B. Capital Structure of the Debtor

#### 1. Prepetition Equity

As of May 14, 2010, 5 million shares of preferred stock of the Debtor were authorized and 0 shares were issued and outstanding. The Debtor had 300 million shares of common stock were authorized and 17,466,295 shares were issued and outstanding.

#### 2. Material Prepetition Debt Obligations

As of the Petition Date, the Debtor's total consolidated funded debt obligations were approximately $3,380,700 principal amount and consisted of, among other things, secured and unsecured notes and debentures. The major components of the Debtor's consolidated funded debt obligations are described in greater detail below.

The Debtor's principal obligations for funded debt are: (i) principal and accrued interest due on Secured Loan Agreement and Secured Notes due May 15, 2010 in the approximate amount of $2,036,882; (ii) principal and accrued interest due on 6% Convertible Notes entered into in 2008 in the approximate amount of $202,576; (iii) principal and accrued interest due on 8% Convertible Notes entered into on April 8, 2009 in the approximate amount of $585,397; (iv) principal and accrued interest due on 8% Convertible Notes entered into on July 1, 2009 in the approximate amount of $382,684; and (v) principal and accrued interest due on 8% Convertible Notes entered into from August 25, 2009 through December 24, 2009 in the approximate amount of $537,302.

### C. Board of Directors and Executive Officers

The following is a list of the directors and executive officers as of May 20, 2010.

| Name | Title |
|------|-------|
| J. Lloyd Breedlove | President, Chief Executive Officer, and Chairman of the Board of Directors |
| Stephen Hoelscher | Chief Financial Officer, Secretary, and Director |
| Dr. William Jay Robbins | Director |

**J. Lloyd Breedlove.** J. Lloyd Breedlove has been the Debtor's and ESI's President, Chief Executive Officer and Chairman of the board of directors since January 10, 2006. From June 2003 to 2006, he was the President and Chief Executive Officer of Imalux Corporation, a corporation in the medical imaging equipment industry. Prior thereto, from December 2000 to May 2003, he was the President and Chief Executive Officer of KIVALO, Inc., a healthcare technology company with emphasis on disease management. From 1991 to 1999, Mr. Breedlove served as the Executive Vice President and Group President of Steris Corporation, a developer and manufacturer of infection and contamination control products. From 1989 to 1991, he was the President and Chief Executive Officer of Catheter Research Inc., a developer of a vascular surgery products and prior thereto he was the Director of Sales and held other sales and management positions at Mallinckrodt, Inc., a diverse company focusing on supplying products to the healthcare industry. Mr. Breedlove has served on numerous advisory and corporate boards, with an emphasis on establishing healthcare businesses. Mr. Breedlove received a Bachelor of Business Administration and an MBA from Western Carolina University. Serving in Vietnam, he was awarded the Bronze Star, Bronze Star with Oak Leaf Cluster and the Vietnamese Cross of Gallantry.

**Stephen Hoelscher.** Stephen Hoelscher has been the Debtor's and ESI's Chief Financial Officer, Secretary and a member of the Debtor's board of directors since January 10, 2006. Mr. Hoelscher is a Certified Public Accountant and has 30 years of accounting and auditing experience. Mr. Hoelscher is a 5% owner of, and also the CFO for, Mastodon Ventures, Inc., a financial consulting business in Austin, Texas, a position that has held since 2000. Since May, 2004, Mr. Hoelscher has also served as the Chief Financial Officer of EnXnet, Inc, a Tulsa, Oklahoma based publicly traded technology company. Mr. Hoelscher will continue to provide limited consultation to Mastodon and EnXnet but will devote such time as necessary to the performance of his duties to the Debtor. From 1997 to 2000, Mr. Hoelscher was the Controller for Aperian, Inc. an Austin, Texas based publicly traded company. Mr. Hoelscher received a Bachelor of Business Administration from West Texas A&M University in Canyon, Texas in 1981.

**Dr. William Jay Robbins, M.D., F.A.C.P., A.A.H.I.V.S., Director.** Dr. Robbins' background includes a history of active involvement with infectious disease care, specifically with HIV treatment and immunology. Currently he is a member of the National Board of Directors at the American Academy of HIV Medicine. In 2000, he founded his current practice, Infectious Disease of Central Florida in Orlando, Florida. Dr. Robbins is a member of the National Medical Advisory Board of Aguron Corporation, and is the Florida Chapter President at the American Academy of HIV Medicine. Dr. Robbins is a Principal Investigator for a wide range of clinical research studies with numerous pharmaceutical and biotech companies. He has two decades of clinical trial participation and engages as an expert speaker for Pfizer, GlaxoSmithKline, Gilead Sciences, Roche, and Bohringer-Ingelheim. In additional he has held positions as Clinical Instructor at both NOVA Southeastern University School of Osteopathic Medicine and the Orlando Regional Medical Center. Dr. Robbins earned his Bachelor of Science degree in biology from Lehigh University (1973) and a Doctor of Medicine degree from the University of the State of New York, Albany, New York (1985) He received residency training from the department of internal medicine at the Lutheran Medical Center in Brooklyn, New York (1981-1983) and completed fellowship training in infectious diseases at the University of the State of New York - Downstate Medical Center in Brooklyn, New York (1983-1985).

**D.     Events Leading to Restructuring**

The Debtor's financial difficulties primarily stem from the deteriorating global market, credit, and economic conditions, which began to accelerate in the first half of 2009. As a consequence, through July 2009, the Debtor issued to accredited investors an aggregate of $895,000 of units (each a "Unit" and collectively, the "Units") with each Unit consisting of (i) a $10,000 principal amount 8% subordinated convertible promissory note, convertible into shares of Old Common Stock at an initial conversion price of $0.50 per share, and (ii) a five year

warrant to purchase up to 20,000 shares of Old Common Stock at an exercise price of $0.75 per share. From this transaction, the Debtor received net proceeds of approximately $821,000 from the sale of the Units that has been used to repay certain indebtedness and for operating funds. Additionally, from August 24, 2009 through December 24, 2009, the Debtor issued to accredited investors an aggregate of $515,000 of units (each a "Unit" and collectively, the "Units") with each Unit consisting of (i) a $10,000 principal amount 8% subordinated convertible promissory note, convertible into shares of Old Common Stock at an initial conversion price of $0.50 per share, and (ii) a five year warrant to purchase up to 20,000 shares of Old Common Stock at an exercise price of $0.75 per share. From this transaction, the Debtor received net proceeds of approximately $463,500 from the sale of the Units that has been used for operating funds.

On June 26, 2009, the Debtor entered into that certain Forbearance Agreement with the Secured Lender, agreeing to reduce the exercise price of the 1,500,000 warrants outstanding to $0.20 in exchange for the Secured Lender agreeing to extend the maturity date of the loans aggregating $1,500,000 from July 8, 2009 to September 8, 2009. Additionally, on September 8, 2009, November 8, 2009 and March 31, 2010 the Debtor entered into additional Forbearance Agreements with the Secured Lender, agreeing to extend the maturity date of the loans aggregating $1,500,000 from September 8, 2009 to May 15, 2010.

Despite such capital-raising activities, due to deteriorating global markets, the Debtor's financial difficulties persisted, and it was forced to seek restructuring.

## V.     SUMMARY OF STRATEGIC INITIATIVES

Current management of the Debtor is executing a business plan based upon a series of strategic initiatives, the principal aspects of which are summarized below. The Board of Directors of the Reorganized Debtor, which will be selected pursuant to Section 7.4(b) of the Plan, will have the discretion, in its business judgment, to manage the Debtor as it sees fit. *There can be no assurance that the Board of Directors of the Reorganized Debtor will decide to manage the Debtor in a manner that is consistent with the current management's business strategy.*

### A.     Strategies to Enhance Financial Performance and Achieve Profitability

Management is pursuing strategies designed to enhance financial performance and achieve profitability, and an improving EBITDA trend over the last several years indicates progress on this front. Key elements of the strategic plans include the following:

1.     ESI is pursuing the lucrative oil and gas market with a new product introduction, a non-toxic geobiocide. At a time when the need for increased oil and gas production and environmental concerns are colliding, the Debtor has focused on a more environmentally correct solution for geobiocides with its GeoTru™ Concentrate. GeoTru™ effectively kills under aerobic and anaerobic conditions and at the same time it is non-oxidizing and nonreactive with down-hole chemistries. GeoTru™ can work over a wide pH range, is materials compatible and is not only easy but safe to transport. The rise in oil rig counts, the increased utilization of well stimulation and enhanced oil recovery methods as well as the continued push into deepwater drilling and production will provide a wide range of opportunities for suppliers of both formulated oilfield chemicals and their raw materials. By 2011, over $1 billion in new annual chemical demand will be created by a strong expansion in oilfield activity. Specifically, during the hydraulic fracturing process, many of the chemicals used in treated water are considered toxic and potentially harmful by the EPA. Only about 82% of the solution returns to the surface, leading to environmental concerns. There is growing pressure from Congress for the EPA to more closely monitor the hydraulic fracturing process and the chemicals used during that process. ESI has submitted GeoTru™ to the EPA and is waiting on registration of the geobiocide. Additionally ESI is engaged in active discussions with an international chemicals company with a large oil & gas business to produce and distribute GeoTru™ to the Oil and Gas industry. Further, ESI has developed a relationship with a large hydraulic fracturing company and is pursuing its commitment to use GeoTru™ as its biocide of choice.

2.     ESI plans to expand its current surface care product line by introducing a broad spectrum product both in a RTU liquid and a wipe. Expanding claims for the company's EnviroTru® Disinfectant to qualify as a broad spectrum "hospital grade" disinfectant is a priority. ESI is conducting research and development and plans to reintroduce a hospital grade disinfectant product to replace an earlier product called EcoTru®. The reformulated

disinfectant is expected to demonstrate through testing that it will effectively kill numerous bacteria, fungi, and viruses, including MRSA, Hepatitis B and C, HIV, herpes and influenza. Likewise, in addition to being highly effective as a disinfectant, the reformulated hospital grade product is expected to occupy a unique position in the market place, combining this microbial effectiveness in a disinfectant product which will also have a favorable profile for health and environmental effects. Such a product will open multiple markets worldwide, particularly the medical market. ESI will distribute the product through its current distribution network, capitalize on known distribution in the dental market and seek new distribution relationships in expanded markets. The increased claims will also increase usage by current customers and in current markets.

3.  ESI plans to strengthen the internal sales and marketing organization, focusing on vertical markets, as a means to bolster revenue.

4.  ESI recently signed a National Account Agreement with a national janitorial franchising company (Jan-Pro International), rated as the fastest growing franchise company in the US for the past two (2) years. The company has more than 90 master franchises in the US and is growing at an annual rate of approximately 20%.

5.  ESI will continue to opportunistically engage international distributors.

6.  ESI plans to seek potential strategic partners to co-develop and market a line of personal care products for the retail market.

## B.  Improving Liquidity to Position ESI to Take Advantage of Market Opportunities

In addition to the debt restructurings contemplated by the Plan, management's immediate priorities involve focusing on improving the Debtor's liquidity through the following actions:

1.  The Debtor plans to raise approximately $1.5 million through a Private Placement Offering during these Chapter 11 proceedings. The net proceeds of this raise will provide a minimum of 18 month operations.

2.  ESI plans to negotiate an exclusive Manufacturing and Distribution Agreement for GeoTru™ with a chemical company that is also the sole supplier of the active ingredient used in ESI products, PCMX. ESI plans to negotiate a price reduction for the active ingredient as part of the agreement and thus reduce overall product costs.

## C.  Improving and Enhancing ESI's Existing Products

In the near term, the Debtor plans the following product/product-line enhancements for ESI:

1.  Expand US EPA claims for current surface disinfectant to that of a broad spectrum disinfectant.

2.  Add a wipe product to the current surface disinfectant product offering.

3.  Through joint effort with distribution partners, expand claims for current surface disinfectant in Korea and Japan.

4.  Working with potential distribution partner, expand environmental testing for GeoTru™ geobiocide. Such expanded testing will open more offshore opportunities, particularly in the North Sea.

5.  In cooperation with hydraulic fracturing partner, enhance the current GeoTru™ formulation to produce a more robust product for "poor water" applications.

## VI. THE CHAPTER 11 CASE

### A. Continuation of Business; Stay of Litigation

On the Petition Date, the Debtor filed a voluntary petition for relief under Chapter 11 of the Bankruptcy Code. Since the Petition Date, the Debtor has continued to operate as debtor-in-possession subject to the supervision of the Bankruptcy Court and in accordance with the Bankruptcy Code. The Debtor is authorized to operate its business in the ordinary course of business, with transactions outside of the ordinary course of business requiring Bankruptcy Court approval.

An immediate effect of the filing of the Debtor's bankruptcy petition was the imposition of the automatic stay under the Bankruptcy Code that, with limited exceptions, enjoined the commencement or continuation of all collection efforts by creditors, the enforcement of liens against property of the Debtor, and the continuation of litigation against the Debtor. This relief provided the Debtor with the "breathing room" necessary to assess and reorganize its business. The automatic stay remains in effect, unless modified by the Bankruptcy Court, until consummation of a plan of reorganization.

### B. First Day Pleadings and Orders

Also on the Petition Date, the Debtor filed several motions seeking the relief provided by certain so-called "first day orders." First day orders are intended to facilitate the transition between a debtor's prepetition and postpetition business operations by approving certain regular business conduct that may not be authorized specifically under the Bankruptcy Code or as to which the Bankruptcy Code requires prior approval by the Bankruptcy Court.

As qualified by the detailed provisions of the applicable first-day motion and proposed order, the Debtor sought approval for, among other things, debtor-in possession, or "DIP", financing. Due to its financing needs, the Debtor filed a motion seeking authorization to obtain postpetition financing, pursuant to section 364 of the Bankruptcy Code, in an aggregate amount not to exceed $414,000 from ANPG Lending, LLC and Laidlaw & Company (UK) Ltd., as DIP Lenders.

## VII. SUMMARY OF THE PLAN OF REORGANIZATION

The primary objectives of the Plan are to (i) alter the Debtor's debt and capital structures to permit it to emerge from its Chapter 11 Case with a viable capital structure, (ii) maximize the value of the ultimate recoveries to all creditor groups on a fair and equitable basis, and (iii) settle, compromise or otherwise dispose of certain Claims and Interests on terms that the Debtor believes to be fair and reasonable and in the best interests of its estate and creditors. The Plan provides for, among other things: (A) the cancellation of certain indebtedness in exchange for new equity and (B) the discharge of certain Claims and cancellation of Interests in exchange for new equity.

The statements contained in this Disclosure Statement include summaries of the provisions contained in the Plan and in documents referred to therein. The statements contained in this Disclosure Statement do not purport to be precise or complete statements of all the terms and provisions of the Plan or documents referred to therein, and reference is made to the Plan and to such documents for the full and complete statements of such terms and provisions.

The Plan itself and the documents referred to therein control the actual treatment of Claims against and Interests in the Debtor under the Plan and will, upon the Effective Date, be binding upon all Holders of Claims against and Interests in the Debtor and its Estate, the Reorganized Debtor and other parties in interest. In the event of any conflict between this Disclosure Statement, on the one hand, and the Plan or any other operative document, on the other hand, the terms of the Plan and such other operative document are controlling.

## A.      Overview of Chapter 11

Chapter 11 is the principal business reorganization Chapter of the Bankruptcy Code.  Under Chapter 11 of the Bankruptcy Code, a debtor is authorized to reorganize its business for the benefit of itself, its creditors, and interest holders.  Another goal of Chapter 11 is to promote equality of treatment for similarly situated creditors and similarly situated interest holders with respect to the distribution of a debtor's assets.

The commencement of a Chapter 11 case creates an estate that is comprised of all of the legal and equitable interests of the debtor as of the filing date.  The Bankruptcy Code provides that the debtor may continue to operate its business and remain in possession of its property as a "debtor in possession."

The consummation of a plan of reorganization is the principal objective of a Chapter 11 case.  A plan of reorganization sets forth the means for satisfying claims against and interests in a debtor.  Confirmation of a plan of reorganization by the Bankruptcy Court makes the plan binding upon the debtor, any issuer of securities under the plan, any person or entity acquiring property under the plan, and any creditor of or equity security holder in the debtor, whether or not such creditor or equity security holder (i) is impaired under or has accepted the plan or (ii) receives or retains any property under the plan.  Subject to certain limited exceptions and other than as provided in the plan itself or the confirmation order, the confirmation order discharges the debtor from any debt that arose prior to the date of confirmation of the plan and substitutes therefore the obligations specified under the confirmed plan, and terminates all rights and interests of equity security holders.

## B.      Overall Structure of the Plan

The Debtor believes that the Plan provides the best and most prompt possible recovery to the Debtor's Claim and Interest Holders.  Under the Plan, Claims against and Interests in the Debtor are divided into different classes.  If the Plan is confirmed by the Bankruptcy Court and consummated, on the Distribution Date, and at certain times thereafter as Claims are resolved, liquidated or otherwise allowed, the Debtor will make distributions in respect of certain Classes of Claims and Interests as provided in the Plan.  The Classes of Claims against and Interests in the Debtor created under the Plan, the treatment of those Classes under the Plan and distributions, if any, to be made under the Plan are described below.

## C.      Classification and Treatment of Claims and Interests

### 1. Administrative Claims.

Subject to the provisions of sections 330(a), 331, and 503(b) of the Bankruptcy Code, each Holder of an Administrative Claim shall be paid by the Debtor, at its election, in full, in Cash, upon the latest of (i) the Effective Date, (ii) the due date thereof in accordance with its terms, (iii) in respect of liabilities incurred in the ordinary course of business, the date upon which such liabilities are payable in the ordinary course of such Debtor's business, consistent with past practices, or (iv) such other date as may be agreed upon between the Holder of such Administrative Claim, the Debtor, and the Secured Lender.

### 2. Priority Tax Claims.

Unless the Holder of such Claim and the Debtor agree to a different treatment, on the Effective Date, each Holder of a Priority Tax Claim shall either (i) have its Claim Reinstated or (ii) receive equal Cash payments during a period not to exceed six years after the assessment of the tax on which such Claim is based, totaling the aggregate amount of such Claim, plus simple interest at the rate required by applicable law on any outstanding balance from the Effective Date, or such lesser rate as is agreed to by a particular taxing authority.

### 3. Class 1: Non-Tax Priority Claims.

Unless the Holder of such Claim and the Debtor agree to a different treatment, on the Effective Date, each Holder of a Non-Tax Priority Claim shall have its Claim Reinstated.

*4. Class 2: Other Secured Claims.*

Unless the Holder of such claim and the Debtor agree to a different treatment, on the Effective Date, each Holder of an Other Secured Claim shall have its Claim Reinstated.

*5. Class 3: Secured Lien Claims.*

On the Effective Date, each Holder of a Secured Lien Claim shall receive its Pro Rata share of 61% of the Distributable New Equity, subject to dilution if the Debtor consummates the Private Placement Offering. The Secured Lender shall receive payment, in cash, of all reasonable fees, expenses and disbursements, including attorney's fees.

*6. Class 4: Convertible Notes Claims.*

On the Effective Date, each Holder of a Convertible Notes Claim shall be entitled to receive its Pro Rata share of 34% of the Distributable New Equity, subject to dilution if the Debtor consummates the Private Placement Offering.

*7. Class 5: General Unsecured Claims.*

Unless the Holder of such Claim and the Debtor agree to a different treatment, on the Effective Date, each Holder of a General Unsecured Claim shall be entitled to receive cash in an amount equal to 50% of the allowed amount of such Claim.

*8. Class 6: Old Common Stock Interests.*

On the Effective Date, the Old Common Stock will be cancelled, and Holders of Old Common Stock shall receive their Pro Rata share of 5% of the Distributable New Equity, subject to dilution if the Debtor consummates the Private Placement Offering.

*9. Special Provision Regarding Unimpaired Claims.*

Except as otherwise explicitly provided in the Plan, nothing shall affect the Debtor's or the Reorganized Debtor's rights and defenses, both legal and equitable, with respect to any Unimpaired Claims, including, but not limited to, all rights with respect to legal and equitable defenses to setoffs or recoupments against Unimpaired Claims.

*10. Procedures For Resolving Disputed, Contingent, and Unliquidated Claims.*

The Debtor and Reorganized Debtor may contest the amount and validity of any disputed, contingent or unliquidated Claim by filing Claim objections with the Bankruptcy Court in accordance with the Local Rules.