# IN THE UNITED STATES BANKRUPTCY COURT
# FOR THE DISTRICT OF DELAWARE

| | | |
|---|---|---|
| In re: | : | Chapter 11 |
| ANPATH GROUP, INC., | : | Case No. 10-11652 (KJC) |
| Debtor. | : | |

## DEBTOR'S MOTION FOR ENTRY OF INTERIM AND FINAL ORDERS AUTHORIZING DEBTOR TO (I) OBTAIN ADDITIONAL POSTPETITION FINANCING PURSUANT TO BANKRUPTCY CODE SECTION 364; (II) GRANT PRIMING LIENS AND SUPERPRIORITY CLAIMS PURSUANT TO BANKRUPTCY CODE SECTIONS 364(c) AND (d); (III) PROVIDE ADEQUATE PROTECTION TO PREPETITION SECURED LENDER PURSUANT TO BANKRUPTCY CODE SECTIONS 361, 362, 363, AND 364 AND (IV) TO SCHEDULE FINAL HEARING PURSUANT TO BANKRUPTCY RULE 4001

TO THE HON. KEVIN J. CAREY, CHIEF UNITED STATES BANKRUPTCY JUDGE:

Anpath Group, Inc. as debtor-in-possession ("Anpath" or the "Debtor"), respectfully represents:

1. By this motion (the "Motion"), Anpath requests entry of interim and final orders (the "DIP Orders") granting authorization to (i) obtain additional postpetition financing pursuant to section 364 of title 11, United States Code (the "Bankruptcy Code"); (ii) grant first lien superpriority claims pursuant to section 364 (c) and (d) of the Bankruptcy Code; (iii) provide adequate protection to its prepetition secured lender pursuant to sections 361, 362, 363 and 364 of the Bankruptcy Code (collectively, the "DIP Financing"); and (iv) schedule a final hearing (the "Final Hearing") pursuant to Fed. R. Bankr. P. 4001. Pending the Final Hearing, the DIP Financing will be implemented on an interim basis pursuant to the Debtor-In-Possession Credit and Security Agreement, dated as of May 20, 2010 (the "Initial DIP Agreement"), as amended by the First Amendment to the Initial DIP Agreement, annexed to this Motion (the "First Amendment", collectively with the Initial DIP Agreement, the "DIP Agreement"), between Anpath Group, as borrower (the "Borrower"), debtor and debtor-in-possession, ANPG Lending,

LLC, and Laidlaw & Company (UK) Ltd., as administrative agent (the "DIP Lenders"). A copy of the proposed interim order (the "Interim Order"), which is substantially the same as the interim order entered by the Court earlier in this case, is attached as Exhibit A.

2. Material provisions of the DIP Financing are set out at the following sections of the DIP Agreement and/or the Interim Order:

(a) Borrowing Limits. The DIP Lenders agree to make advances (the "Advances"") to the Borrower in an aggregate amount not to exceed $1,664,000 (the "Maximum Amount"). Availability under the DIP Facility shall (a) prior to the entry of a final DIP order (the "Final Order") be in an amount not to exceed $155,000; and (b) upon entry of the Final Order, be in an amount not to exceed the Maximum Amount. Initial DIP Agreement, § 2.1; First Amendment, § 1; Interim Order, ¶ 7(a).

(b) Interest Rate. The Base Rate of interest shall be 7%. Upon the occurrence and during the continuance of an Event of Default, at the election of the DIP Lenders, all obligations under the DIP Agreement shall bear interest at a rate of 2.00% above the otherwise applicable rate. Initial DIP Agreement, § 2.2.

(c) Maturity. Borrowings and other extensions of credit under the DIP Agreement shall mature, be repayable in full, and the DIP Facility shall terminate on such date that is the earliest to occur of (i) the effective date of the confirmed Proposed Plan of Reorganization, and (ii) the date on which obligations under the DIP Agreement are accelerated following the occurrence of an Event of Default. Initial DIP Agreement definition "Maturity Date".

(d) Payment. In the event maturity occurs upon the effective date of the Proposed Plan of Reorganization, as contemplated in the DIP Agreement, all payments to be made shall be made on such maturity in the form of 7.8% of the new common stock of the reorganized Debtor, subject to dilution if upon consummation of that certain rights offering contemplated in Section 7.6 of the plan of reorganization. Initial DIP Agreement, § 2.3; First Amendment, §2.

(e) Events of Default. Events of default ("Events of Default") include provisions relating to: (i) the appointment of a trustee or examiner, or dismissal or conversion of any of the Cases; (ii) confirmation of any plan of reorganization or liquidation in any of the Cases other than the Proposed Plan of Reorganization without the consent of ANPG Lending, LLC; (iii) filing of a Chapter 11 plan of reorganization or liquidation by a person or entity other than Anpath that does not require the payment in full, on the effective date thereof, of all extensions of credit under the DIP Agreement; (iv) Anpath's failure to file the Proposed Plan of Reorganization as and when required under the terms of the DIP Agreement; (v) failure to obtain entry of a confirmation order from the Bankruptcy Court with

respect to such plan within two hundred and ten (210) days of the Petition Date; (vi) amendment (other than as consented by the DIP Lenders) or stay of either of the Financing Orders or reversal, modification, or vacation of either of the Financing Orders, whether on appeal or otherwise; (vii) the filing of any motion or other request with the Bankruptcy Court seeking authority to use any cash proceeds of any of the DIP Collateral without the DIP Lenders' consent or Debtor seeking any financing under Section 364(d) of the Bankruptcy Code secured by any DIP Collateral that does not require the payment in full of all extensions of credit under the DIP Agreement; (viii) the challenge of a Debtor of (1) the validity, extent, perfection, or priority of any Liens of the Prepetition Lenders with respect to any of the DIP Collateral or (2) the validity or enforceability of any of the Obligations (as defined in the Prepetition Credit Agreement); (ix) any Person holding a Lien upon any pre-petition or post-petition assets of the Debtor being granted relief from the automatic stay with respect to any DIP Collateral or any other asset of the Debtor; or (x) the cessation by the Debtor or its subsidiary, EnviroSystems Inc., of all or any material part of their business operations (other than in any connection with a sale of assets consented to by the DIP Lenders). Initial DIP Agreement, Events of Default, § 8.1; Interim Order, ¶ 18(b).

(f) <u>Liens</u>. All Obligations of the Debtor to the DIP Lenders shall be secured by (i) a perfected first-priority lien on all now owned or hereafter acquired assets of the DIP Borrower that are not subject to valid, perfected and non-avoidable liens as of the Petition Date (collectively, the "<u>First Lien Collateral</u>"); provided, further, that the First Lien Collateral shall not be subject to Causes of Action but, subject to the entry of the Final Order, the First Lien Collateral shall include any proceeds or property recovered in respect of any Causes of Action; and (ii) a perfected junior lien on all property of the DIP Borrower that is subject to valid, perfected and non-avoidable liens as of the Petition Date or to liens in existence as of the Petition Date that are perfected subsequent to the Petition Date as permitted by Section 546(b); (iii) first-priority, perfected liens all assets that constitute collateral under the Prepetition Credit Agreement subject only to the lien of the Prepetition Lender which shall rank <u>pari passu</u> with the DIP Obligation. Initial DIP Agreement, § 3.1; Interim Order, ¶ 8, 17.

3. The provisions described in Federal Rule of Bankruptcy Procedure 4001(c)(1)(B)(i)-(xi), to the extent applicable, are set out at the following sections of the DIP Agreement and the Interim Order:

(i) *Grant of priority or a lien on property of the estate.* Initial DIP Agreement, §§ 3.1, 5.8; Interim Order ¶ 8, 9.

(ii) *Adequate protection or priority for a claim that arose before the commencement of the case.* Initial DIP Agreement, Adequate Protection, §§ 3.1; 5.8; Interim Order, ¶ 15.

(iii) *Waiver or modification of the automatic stay.* Initial DIP Agreement, Rights and Remedies, §§ 8.2; Interim Order, ¶ 10.

(iv) *Waiver or modification of authority to file a plan, seek an extension of time in which the debtor has the exclusive right to file a plan, request use of cash collateral or request authority to obtain credit.* Initial DIP Agreement, Events of Default, § 8.1; Interim Order, ¶ 6.

(v) *Establishment of deadlines for filing a plan, for approval of a disclosure statement, for a hearing on confirmation, or for entry of a confirmation order.* Initial DIP Agreement, Events of Default, § 8.1; Interim Order, ¶ 6.

(vi) *Indemnification of any entity.* Initial DIP Agreement, Release and Indemnification, § 10.12; Interim Order, ¶ 20.

(vii) *Release, waiver or limitation on rights under Section 506(c).* Initial DIP Agreement, Financing Orders, § 6.13; Interim Order, ¶ 11.

(viii) *Liens granted on claims arising under Chapter 5.* Initial DIP Agreement, Priority and Liens; Collateral, § 3.1; Interim Order, ¶ 8(a).

4. In addition, the provisions described in Rule 4001-2 of the Local Bankruptcy Rules, to the extent applicable, are set out in the following sections of the DIP Agreement and the Interim Order:

(i) *Material conditions to closing and borrowing, including budget provisions.* Initial DIP Agreement, Budget, §§ 4.1, 4.2, 6.15, Conditions Precedent, § 4.2; Interim Order, ¶¶ 4, 6.

(ii) *Pricing and economic terms, including letter of credit fees, commitment fees, any other fees, and the treatment of costs and expenses of the lenders, any agent for the lenders, and their respective professionals.* Initial DIP Agreement, Costs and Expenses, § 9.5; Interim Order, ¶ 6, 20.

(iii) *Any effect on existing liens of the granting of collateral or adequate protection provided to the lender and any priority or superpriority provisions.* Initial DIP Agreement, §§ 3.1, 5.8; Interim Order, ¶¶ 8, 9.

(iv) *Any carve-out from liens or superpriorities.* Initial DIP Agreement, §§ 5.8, 5.15, 6.13; Interim Order, ¶ 12.

(v) *Any provision that would limit the Court's power or discretion in a material way, or would interfere with the exercise of the fiduciary duties, or restrict the rights and powers, of the trustee, debtor-in-possession, or a committee appointed under § 1102 or § 1114 of the Bankruptcy Code, or any fiduciary of the estate, in connection with the operation,*

*financing, use or sale of the business or property of the estate, but excluding any agreement to repay postpetition financing in connection with a plan or to waive any right to incur liens that prime or are pari passu with liens granted under § 364.* Initial DIP Agreement, Purpose/Use of Proceeds, § 2.6; Interim Order ¶ 18, 19, 20, 21, 25.

(vi) *Any limitation on the lenders' obligation to fund certain activities of the trustee, debtor-in-possession, or a committee appointed under § 1102 or § 1114 of the Bankruptcy Code.* Initial DIP Agreement, Purpose/Use of Proceeds, § 2.6; Interim Order ¶ 19, 20.

(vii) *Termination or default provisions, including events of default, any effect of termination or default on the automatic stay or the lenders' ability to enforce remedies, any cross-default provision, and any terms that provide that the use of cash collateral or the availability of credit will cease on (i) the filing of a challenge to the lenders' prepetition lien or the lenders' prepetition claim based on the lenders' prepetition conduct; entry of an order granting relief from the automatic stay other than an order granting relief from the stay with respect to material assets; (iii) the grant of a change of venue with respect to the case or any adversary proceeding; (iv) management changes or the departure, from the debtor, of any identified employees, (v) the expiration of a specified time for filing a plan; or (vi) the making of a motion by a party in interest seeking any relief (as distinct from an order granting such relief).* Initial DIP Agreement, Events of Default, §§ 8.1, 8.2; Interim Order ¶ 10.

## JURISDICTION

5. This Court has jurisdiction to consider this matter pursuant to 28 U.S.C. §§ 157 and 1334. This is a core proceeding pursuant to 28 U.S.C. § 157(b). Venue is proper before this Court pursuant to 28 U.S.C. §§ 1408 and 1409.

## BACKGROUND

### General

6. On the date hereof (the "Petition Date"), Anpath commenced a voluntary case under chapter 11 of the Bankruptcy Code in this Court to pursue and confirm a restructuring on a consensual basis with its various creditor constituencies. Anpath continues to operate its

business and manage its properties as debtor-in-possession pursuant to sections 1107(a) and 1108 of the Bankruptcy Code.

### Anpath's Businesses

7. The Debtor, through its operating subsidiary, EnviroSystems, Inc. ("ESI"), produces disinfecting, sanitizing and cleaning products designed to help prevent the spread of infectious microorganisms, while minimizing the harmful effects to people, application surfaces and the environment. ESI's disinfectant products are classified with the Environmental Protection Agency's lowest possible toxicity rating (Toxicity Category IV) in each of the categories for which the Environmental Protection Agency requires toxicity testing (including primary skin, eye, acute inhalation and oral and dermal toxicity).

8. The primary ingredient in ESI's products is Parachlorometaxylenol ("PCMX"), a substance widely used as an antimicrobial agent in surgical hand and skin scrubs. ESI has developed a unique and proprietary chemical emulsion biocide technology platform based on PCMX and have used this platform to develop a product portfolio in the following areas: (i) surface care products (*i.e.*, disinfectants, sanitizers and cleaners (including wipes)); (ii) animal care products (*i.e.*, skin and hoof care treatment and animal shampoo); (iii) personal care products (*i.e.*, antimicrobial hand soaps, hand sanitizers and facial scrubs (including wipes)); and (iv) geo-biocides (i.e., biocides for use in the oil and gas industry).

9. ESI's products are sold under a variety of trademarks and trade names, including "EcoTru®" (which is currently registered in the United States, Japan, and Taiwan), EnviroTru®, EquineTru®, SurfaceTru™, KeraTru™, GeoTru™ and Anpath (each of which is in the process of being registered). ESI owns all of the trademarks and trade names that it believes to be material to the operation of its business.

10. The Debtor is headquartered in Mooresville, North Carolina and, together with its subsidiaries, currently has five (5) full-time employees.

11. Additional information concerning the Debtor, its capital and debt structure, and the events leading up to the commencement of these chapter 11 cases is contained in the Declaration of J. Lloyd Breedlove In Support of Chapter 11 Petitions and First Day Motions (the "<u>Breedlove Declaration</u>"), which was filed on May 20, 2010 as [Docket No. 5] and incorporated by reference.

### **Prepetition Funding of the Debtor's Operations**

**A.     The Prepetition Loan and Security Agreement**

12. On or about January 8, 2009, the Debtor and ANPG Lending LLC (the "<u>Prepetition Lender</u>") entered into a Loan and Security Agreement pursuant to which the Prepetition Lender purchased certain secured convertible promissory notes from Anpath in the aggregate principal amount of $1,500,000. Pursuant to the terms of the Notes, the Principal Amount, together with all accrued and unpaid interest thereon (collectively, with the Principal Amount, the "<u>Outstanding Amount</u>"), was originally due and payable in full on July 8, 2009. The Prepetition Lender agreed to extend the original maturity date of the Outstanding Amount and, on September 8, 2009 and November 8, 2009, respectively, entered into certain forbearance agreements with the Debtor. Per the terms of the November 8, 2009 forbearance agreement, the Outstanding Amount was due and payable on March 31, 2010. Additionally, on April 26, 2010, Anpath borrowed an additional $100,000 from the Prepetition Lender evidenced by a promissory note of even date therewith. All prepetition obligations of Anpath to the Prepetition Lender are guaranteed by Anpath's subsidiaries ESI and EnviroSystems Holdings, Inc.

## Debtor's Proposed Postpetition DIP Agreement

A.  **Need for Postpetition Financing**

13. As explained more fully in the Breedlove Declaration, Anpath has faced a number of challenges which, taken together, have had a negative impact on its overall financial performance.

14. As a result, Anpath, began to explore capital structure restructuring alternatives, including refinancing options, recapitalizations, and a potential chapter 11 filing. After significant analysis and negotiations, Anpath determined that a chapter 11 filing was in the best interest of its creditors. The Debtor has negotiated the terms of a consensual restructuring of its balance sheet with its creditor constituencies, which is memorialized in the amended plan and disclosure statement filed with the petition. The Debtor had anticipated confirming its plan and emerging from Chapter 11 in August, 2010. Unfortunately, the Debtor has experienced a delay in raising the necessary exit financing to emerge from Chapter 11. In order to provide adequate liquidity for its and ESI's operations during its effort to reorganize its business, Anpath determined that it requires the additional postpetition financing as described herein, which terms are substantially the same as those approved by the Court earlier in this case. The Debtor believes that with this additional financing it will be able to continue its operations until it is able to confirm its plan later this year.

B.  **Prepetition Efforts To Find Sources of DIP Financing and the DIP Agreement**

15. Prior to the Petition Date, Anpath surveyed various sources of postpetition financing. Anpath determined borrowing from another postpetition lender would require security senior to the Prepetition Lender and could only be accomplished through contested hearing on whether the requirements of section 364(d) of the Bankruptcy Code had been

satisfied. Moreover, Anpath realized that sources of new capital, if available at all, were significantly more expensive than obtaining postpetition financing from the DIP Lenders.

16. In view of these circumstances, the DIP Lenders, one of which is also the Prepetition Lender, were willing to extend postpetition financing on the terms and conditions described herein. Ultimately, Anpath concluded that the DIP Agreement proposed by the DIP Lenders is desirable because, among other things, the DIP Agreement permits the Debtor to obtain the postpetition financing required for their reorganization without having to prime the Prepetition Lender through a contested hearing on whether the requirements of section 364(d) of the Bankruptcy Code could be satisfied.

17. The DIP Lenders are willing to provide additional postpetition financing on the terms and conditions described herein. Ultimately, Anpath concluded that the DIP Agreement proposed by the DIP Lenders is desirable and in the best interests of creditors.

C. **Implementation of the DIP Agreement**

18. Anpath and the DIP Lenders engaged in extensive, arms' length negotiations with respect to the terms and conditions of the DIP Facility. These negotiations culminated in agreement upon the proposed financing, including the form of the DIP Agreement, attached hereto as <u>Exhibit B</u>. Significantly, the DIP Agreement allows Anpath to immediately request advances from the DIP Lenders, pending this Court's entry of the Final DIP Order. This commitment will ensure that Anpath will be able to meet its obligations as well as provide adequate liquidity to operate its, and ESI's business. Upon entry of the Final Order, Anpath will be permitted to request advances under the DIP Facility in an aggregate amount not to exceed the Maximum Loan Amount.

19. Anpath and the DIP Lenders have agreed upon a budget (the "Budget"), annexed as Exhibit B to the Interim Order, which includes expenditures that are necessary to avoid irreparable harm through the date of the Final Hearing on this Motion (the "Budget Period"). The Debtor will file a supplement to the Budget prior to the Final Hearing on the Motion to cover the period through its anticipated confirmation hearing.

20. Because the DIP Agreement contains all of the material terms and conditions for the financing described here, Anpath and the DIP Lenders anticipate that they will be able to close on the DIP Agreement no later than five (5) days after entry of the Interim Order.

D. **Adequate Protection for the Prepetition Secured Lender**

21. The Prepetition Secured Lender is entitled, pursuant to sections 361 and 363(e) of the Bankruptcy Code, to adequate protection of its interests in collateral under the DIP Agreement to the extent that there is a diminution in the value of such collateral from and after the Petition Date. As adequate protection for any such diminution in value, the Prepetition Secured Lender shall be granted the following:

- effective and perfected as of the date of entry of the Interim Order and without the necessity of the extension of the mortgages, security agreements, pledge agreements, financing statements or other agreements, (i) a valid, perfected, replacement security interest in and lien on the collateral upon which there exists liens granted pursuant to the Prepetition Credit Agreement (the "Existing Liens"); and (ii) a valid, perfected security interest in and lien on all of the DIP Collateral (together, the "Adequate Protection Liens"), which Adequate Protection Liens shall rank in the same relative priority and right as do the respective Existing Liens (and any security interests granted with respect thereto) as of the Petition Date;

- a superpriority administrative expense claim as provided for in section 507(b) of the Bankruptcy Code (the "Adequate Protection Claims"), pari passu with the Superpriority Claims (as such term is defined in the DIP Agreement) held by the DIP Lenders under the DIP Agreement. Except for the Superpriority Claims (as such term is defined in the DIP Agreement) of the DIP Lenders, no claims shall be permitted with priority pari passu with or senior to the Adequate Protection Claims except for the

carve-out provided under paragraph 13 of the Interim Order to Debtor's counsel and the Office of the United States Trustee;

- current cash payments of all fees and all reasonable professional fees and expenses, in each case, payable to counsel for the Prepetition Lender, under the Prepetition Credit Agreement, promptly upon receipt of invoices therefore; and

- copies of all financial statements (including, without limitation, the monthly financial statements and cash forecasts referred to in the DIP Agreement) furnished to the DIP Lenders (as such term is defined in the DIP Agreement).

22. The foregoing claims are to be granted and the payments are to be made to the Prepetition Secured Lender, for the purpose of, among other things, protecting the Prepetition Secured Lender's claims, obligations, and collateral interests from the potential depreciation and deterioration of such collateral.

## RELIEF REQUESTED

23. Anpath requests that the Court authorize Anpath, as debtor and debtor-in-possession, to obtain senior secured, super-priority, postpetition financing up to an aggregate principal amount of $1,664,000, pursuant to the DIP Agreement, from the DIP Lenders pursuant to the terms of this Motion, the DIP Orders and the DIP Agreement. The proposed financing will be pari passu with all obligations under the Prepetition Credit Agreement.

24. Pending the entry of the Final Order, Anpath requests that the Court authorize it, on an interim basis, (i) to borrow up to $155,000 under the DIP Credit Agreement, (ii) to grant to the DIP Lenders the liens and superpriority claims described herein, (iii) to provide adequate protection in favor of Prepetition Secured Lender, as described herein and in the Interim Order, (iv) approve the proposed notice of the Final Hearing and the adequacy of the proposed service thereof and (v) schedule the Final Hearing.

## BASIS FOR REQUESTED RELIEF

### The DIP Credit Agreement Should Be Authorized

25. Approval of the DIP Agreement will provide Anpath with immediate and ongoing access to cash to ensure payment of its, and ESI's, current and ongoing operating expenses, for the anticipated duration of this Chapter 11 case. Without authorization to enter into the DIP Agreement, Anpath, and its subsidiaries, may experience deterioration in customer and/or vendor confidence as such constituencies may harbor doubt with respect to Anpath's liquidity and ability to emerge from this Chapter 11 case as a viable enterprise. The credit provided under the DIP Agreement will help enable Anpath to operate its, and ESI's, business in the ordinary course and in an orderly and reasonable manner to preserve and enhance the value of its estate for the benefit of all parties in interest. Without the proposed financing, Anpath and its non-debtor subsidiaries would be forced to shut down their operations and liquidate their assets. Thus, the implementation of the DIP Agreement will promote a successful reorganization which is in prospect and is supported by the Debtor's creditors. Accordingly, the timely approval of the relief requested herein is imperative.

26. Section 364(c) of the Bankruptcy Code provides, among other things, that if a debtor is unable to obtain unsecured credit allowable as an administrative expense under section 503(b)(1) of the Bankruptcy Code, the court may authorize the debtor to obtain credit or incur debt (a) with priority over any and all administrative expenses as specified in section 503(b) or 507(b) of the Bankruptcy Code, (b) secured by a lien on property of the estate that is not otherwise subject to a lien, or (c) secured by a junior lien on property of the estate that is subject to a lien. 11 U.S.C. § 364. Anpath proposes to provide, among other things, superpriority claims, security interests, and liens pursuant to sections 364(c)(1), (2), (3) and (d) of the Bankruptcy Code.

27. Anpath's goal of a successful reorganization can be achieved only if Anpath is immediately authorized to borrow up to $155,000 under the DIP Agreement and to use such proceeds to operate its business. Anpath has been unable to procure sufficient financing in the form of unsecured credit allowable under section 503(b)(1), as an administrative expense under section 364(a) or (b), or in exchange for the grant of a superpriority administrative expense claim pursuant to section 364(c)(1). Anpath has not been able to obtain postpetition financing or other financial accommodations from any alternative prospective lender or group of lenders on more favorable terms and conditions than those for which approval is sought herein.

28. Anpath negotiated with the DIP Lenders extensively and at arms' length. Provided that a debtor's business judgment does not run afoul of the provisions of, and policies underlying, the Bankruptcy Code, courts grant a debtor considerable deference in acting in accordance therewith. See, e.g., Bray v. Shenandoah Fed. Sav. & Loan Ass'n (In re Snowshoe Co.), 789 F.2d 1085, 1088 (4th Cir. 1986); In re Ames Dep't Stores. Inc., 115 B.R. 34, 40 (Bankr. S.D.N.Y. 1990) ("[C]ases consistently reflect that the court's discretion under section 364 is to be utilized on grounds that permit reasonable business judgment to be exercised so long as the financing agreement does not contain terms that leverage the bankruptcy process and powers or its purpose is not so much to benefit the estate as it is to benefit parties in interest"); see also In re Curlew Valley Assocs., 14 B.R. 506, 513-14 (Bankr. D. Utah 1981); In re Simasko Prod. Co., 47 B.R. 444, 449 (D. Colo. 1985).

29. Furthermore, section 364(d) does not require that a debtor seek alternative financing from every possible lender; rather, the debtor simply must demonstrate sufficient efforts to obtain financing without the need to grant a senior lien. In re Snowshoe Co., 789 F.2d at 1088 (demonstrating that credit was unavailable absent the senior lien by establishment of

unsuccessful contact with other financial institutions in the geographic area); In re 495 Central Park Ave Corp., 136 B.R. 626, 631 (Bankr. S.D.N.Y. 1992) (debtor testified to numerous failed attempts to procure financing from various sources, explaining that "most lend money only in return for a senior secured position").

30.  The terms and conditions of the DIP Agreement are fair and reasonable, and were negotiated extensively by well-represented, independent parties in good faith and at arms' length. Accordingly, the DIP Lenders and all obligations incurred under the DIP Agreement should be accorded the benefits of section 364(e) of the Bankruptcy Code.

### The Proposed Adequate Protection Should Be Authorized

31.  Section 363(e) of the Bankruptcy Code provides that, "on request of an entity that has an interest in property used . . . or proposed to be used by a debtor-in-possession, the court . . . shall prohibit or condition such use . . . as is necessary to provide adequate protection of such interest." 11 U.S.C. § 363(e). Section 361 of the Bankruptcy Code delineates the forms of adequate protection, which include periodic cash payments, additional liens, replacement liens and other forms of relief. 11 U.S.C. § 361. What constitutes adequate protection must be decided on a case-by-case basis. See In re O'Connor, 808 F.2d 1393, 1396 (10th Cir. 1987); In re Martin, 761 F.2d 472 (8th Cir. 1985). The focus of the requirement is to protect a secured creditor from diminution in the value of its interest in the particular collateral during the period of use. See In re Kain, 86 B.R. 506, 513 (Bankr. W.D. Mich. 1988); Delbridee v. Production Credit Assoc. and Federal Land Bank, 104 B.R. 824 (E.D. Mich. 1989); In re Leduemere Land Corp., 116 B.R. 338, 343 (Bankr. D. Mass. 1990).

32.  The Prepetition Lender has agreed to Anpath's entry into the DIP Agreement in consideration for the adequate protection provided to it under the DIP Agreement. Moreover, the replacement liens, cash payments and other protections offered to the Prepetition Secured Lender

will sufficiently protect its interest in any collateral taken as security under the Prepetition Credit Agreement. Accordingly, the adequate protection proposed here is fair and reasonable and sufficient to satisfy the requirements of Bankruptcy Code sections 363(c)(2) and (e).

### The Automatic Stay Should Be Modified on a Limited Basis

33. The relief requested herein contemplates a modification of the automatic stay (to the extent applicable) to permit Anpath to (i) grant the security interests, liens, and superpriority claims described above with respect to the DIP Lenders, as the case may be, and to perform such acts as may be requested to assure the perfection and priority of such security interests and liens; (ii) permit the DIP Lenders to exercise, upon the occurrence and during the continuance of an event of default and after five business days' notice thereof, all rights and remedies under the DIP Agreement; and (iii) implement the terms of the proposed interim and final orders.

34. Stay modifications of this kind are ordinary and standard features of postpetition debtor financing facilities and, in Anpath's business judgment, are reasonable and fair under the present circumstances.

### Interim Approval Should Be Granted

35. Bankruptcy Rules 4001(b) and (c) provide that a Final Hearing on a motion to obtain credit may not be commenced earlier than fourteen (14) days after the service of such motion. Upon request, however, the Court is empowered to conduct a preliminary expedited hearing on the motion and authorize the obtaining of credit to the extent necessary to avoid immediate and irreparable harm to a debtor's estate pending an Anpath requests that the Court conduct an expedited preliminary hearing on this motion and (a) authorize Anpath to borrow up to $155,000 under the DIP Agreement on an interim basis, pending entry of a final order, in order to (i) maintain, finance and ensure the ongoing operations of Anpath and ESI, and

(ii) avoid immediate and irreparable harm and prejudice to Anpath's estates and all parties in interest and (b) schedule a hearing to consider entry of a final order.

36. The availability of interim loans under the DIP Agreement will provide Anpath with the ability to meet its and its subsidiaries near-term obligations. Failure to meet these obligations likely would have a long-term negative impact on the value of Anpath's business, to the detriment of all creditors and parties in interest. Accordingly, the interim relief requested is critical to preserving and maintaining the going concern value of Anpath and facilitating its reorganization efforts.

## **NOTICE**

37. No trustee, examiner, or creditors' committee has been appointed in these chapter 11 cases. Anpath has provided notice of this Motion by either electronic mail, facsimile, hand delivery or overnight mail to: (a) the Office of the United States Trustee for the District of Delaware; (b) the creditors holding the twenty largest unsecured claims against Anpath's estates (on a consolidated basis); (c) attorneys for the Prepetition Lender, c/o Paul Silverstein, Andrews Kurth LLP, 450 Lexington Avenue, 15th Floor, New York, NY 10017; (d) the Internal Revenue Service, Insolvency Section, 31 Hopkins Plaza, Room 1150, Baltimore, MD 21201, Attn: District And Regional Directors; and (e) the Securities and Exchange Commission, 15th and Pennsylvania Avenue NW, Washington, DC 20020. The Debtor respectfully submits that no other or further notice need be provided.

38. No previous request for the relief sought herein has been made by Anpath to this or any other court.

WHEREFORE, Anpath respectfully requests entry of the attached order granting the relief sought herein and granting such other and further relief as is just.

Dated: October 1, 2010

COZEN O'CONNOR

/s/ Mark E. Felger

Mark E. Felger (No. 3919)
1201 N. Market Street, Suite 1400
Wilmington, DE 19801
Telephone: (302) 295-2000
Facsimile: (302) 295-2013

*Counsel to the Debtor and Debtor-in-Possession*